# United States District Court

Southern District of New York

18-CV-3637 (JMF)

**KEITH STOKES**,

*Petitioner,*

*- against –*

**JAMIE LAMANNA, Supt.**,

*Respondent.*

## MEMORANDUM OF LAW
## IN SUPPORT OF ANSWER OPPOSING PETITION
## FOR A WRIT OF HABEAS CORPUS

CYRUS R. VANCE, JR.
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
(212) 335-9000
danyappeals@dany.nyc.gov

By: Sylvia  Wertheimer
SW-6225
Attorney of Record

CHRISTOPHER P. MARINELLI
SYLVIA WERTHEIMER
  ASSISTANT DISTRICT ATTORNEYS
    *Of Counsel*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................ 7

THE EVIDENCE AT TRIAL ......................................................................... 10

    The State's Case ...................................................................................... 10

    Petitioner's Case ..................................................................................... 30

PETITIONER'S APPEAL TO THE APPELLATE DIVISION ............................... 30

HABEAS STANDARD OF REVIEW ............................................................... 33

POINT I

    THE TRIAL COURT PROPERLY DENIED
    PETITIONER'S EVE-OF-TRIAL REQUEST TO
    SUBSTITUTE COUNSEL, AND PETITIONER'S
    CONTRARY CLAIM PROVIDES NO BASIS FOR
    HABEAS RELIEF ...................................................................................... 36

POINT II

    THE APPELLATE DIVISION PROPERLY
    DETERMINED THAT THE DISPUTED
    SUPPLEMENTAL INSTRUCTION CONSTITUTED A
    "MEANINGFUL RESPONSE" TO AN "ABSTRACT"
    INQUIRY FROM THE JURY, AND THE
    INSTRUCTION AFFORDS NO BASIS FOR HABEAS
    RELIEF. .................................................................................................... 47

POINT III

    THE TRIAL COURT REASONABLY EXERCISED ITS
    DISCRETION TO DENY PETITIONER'S MOTION
    TO SEVER HIS TRIAL FROM THAT OF HIS
    CODEFENDANT BROTHER, AND PETITIONER'S
    CONTRARY CLAIM AFFORDS NO BASIS FOR
    HABEAS RELIEF ...................................................................................... 60

CONCLUSION ................................................................................................................ 72

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell v. Cone*, 535 U.S. 685 (2002) ...................................................................27-28

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ....................................................... 61, 65

*Brown v. Griffin*, 13 CV 1352(AKH/FM),
    2016 WL 4382668 (S.D.N.Y. May 12, 2016) .................................................. 37

*Bruton v. United States*, 391 U.S. 123 (1968) ........................................................ 55

*California v. Brown*, 479 U.S. 538 (1987) ........................................................ 48, 51

*Carmichael v. Chappius*, 848 F.3d 536 (2d Cir. 2017) ...............................27, 29, 40

*Cupp v. Naughten*, 414 U.S. 141 (1973) ................................................................ 48

*Durden v. Greene*, 492 F. Supp. 2d 414 (S.D.N.Y. 2007)...........................…… 48, 52

*Estelle v. McGuire*, 502 U.S. 62 (1991)...................................................27, 48, 60

*Fry v. Pliler*, 551 U.S. 112 (2007) ..................................................................... 61

*Funches v. Walsh*, No. 05-CV-2839(NRB),
    2006 WL 1063287 (S.D.N.Y. April 21, 2006),
    *aff'd*, 264 Fed. Appx 45 (2d Cir. 2008).................................................. 60

*Gilmore v. Taylor*, 508 U.S. 333 (1993) ............................................................ 48

*Glebe v. Frost*, 135 S. Ct. 429 (2014)................................................................. 28

*Grant v. Hoke*, 921 F.2d 28 (2d Cir. 1990)......................................................60-61

*Harrington v. Richter*, 562 U.S. 86 (2011)......................................................27-29

*McKee v. Harris*, 649 F.2d 927 (2d Cir. 1981) ................................................ 36

*Middleton v. McNeil*, 541 U.S. 433 (2004) ........................................................ 48

*Morris v. Slappy*, 461 U.S. 1 (1983) ......................................................34, 37, 40

*Pizarro v. Bartlett*, 776 F. Supp. 815 (S.D.N.Y. 1991) ...................................... 34

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................................... 34

*Terry v. Conway*, No. 11-CV-2647 (RRM),
    2016 WL 3983516 (E.D.N.Y. July 25, 2016).................................................. 61

*United States v. Calabro*, 467 F.2d 973 (2d Cir. 1972) .................................. 36, 39

*United States v. Careto*, 583 F.3d 152 (2d Cir. 2009) ........................................ 36

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006) ........................................ 34

*United States v. John Doe No. 1*, 272 F.3d 116 (2d Cir. 2001)................................ 36-37, 40

*United States v. O'Connor*, 650 F.3d 839 (2d Cir. 2011) ................................. 60, 64

*United States v. Parker*, 469 F.3d 57 (2d Cir. 2006) .......................................... 34

*United States v. Potamitis*, 564 F. Supp. 1484 (S.D.N.Y. 1983),
    *aff'd*, 739 F.2d 784 (2d Cir. 1984) ................................................................. 63

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ......................................... 60

*Waddington v. Sarausad*, 555 U.S. 179 (2009)................................................. 48, 52

*Wheat v. United States*, 486 U.S. 153 (1988)..................................................... 34

*White v. Woodall*, 572 U.S. 415 (2014) .............................................................. 28

*Williams v. Taylor*, 529 U.S. 362 (2000) ............................................................ 28

*Woods v. Donald*, 135 S. Ct. 1372 (2015) .......................................................... 28

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ................................................ 29, 40

*Zafiro v. United States*, 506 U.S. 534 (1993) ..........................................59-60, 64-65

### STATE CASES

*People v. Abreu*, 219 A.D.2d 513 (1st Dept. 1995) .........................................63-64

*People v. Almodovar*, 62 N.Y.2d 126 (1984)........................................................ 49

*People v. Beriguette*, 84 N.Y.2d 978 (1994) ........................................................ 36

*People v. Bornholdt*, 33 N.Y.2d 75 (1973)........................................................... 61

*People v. Cardwell*, 78 N.Y.2d 996 (1991) .................................................................. 62

*People v. Castro-Restrepo*, 169 A.D.2d 454 (1st Dept. 1991) .......................... 62

*People v. Linares*, 2 N.Y.3d 507 (2004) ...................................................... 35

*People v. Lourido*, 70 N.Y.2d 428 (1987) ..................................................... 49

*People v. Mahboubian*, 74 N.Y.2d 174 (1989) ............................... 26, 55-57, 61-63

*People v. McGinis*, 253 A.D.2d 725 (1st Dept. 1998) ................................... 50

*People v. Medina*, 44 N.Y.2d 199 (1978) ...................................................... 35

*People v. Paulino*, 131 A.D.3d 65 (1st Dept. 2015) ..................................... 39

*People v. Peisahkman*, 29 A.D.3d 352 (1st Dept. 2006) .............................. 63

*People v. Pilgrim*, 146 A.D.3d 478 (1st Dept.), *lv. denied*, 29 N.Y.3d 1085
    (2017) ............................................................................................................ 51

*People v. Porto*, 16 N.Y.3d 93 (2010) ................................................... 25, 35

*People v. Reed*, 35 A.D.3d 194 (1st Dept. 2006) .......................................... 36

*People v. Sides*, 75 N.Y.2d 822 (1990) ....................................................... 35

*People v. Simmons*, 15 N.Y.3d 728 (2010) ................................................. 49

*People v. Steinberg*, 79 N.Y.2d 673 (1992) ........................................... 49, 51

*People v. Stokes*, 149 A.D.3d 510 (1st Dept. 2017) .. 3, 25-26, 30, 32-33, 38, 41-42, 50-51,
    54, 62-63

*People v. Stokes*, 29 N.Y.3d 1087 (2017) ....................................................... 3

*People v. Wilkins*, 16 A.D.3d 217 (1st Dept. 2005) ...................................... 50

## FEDERAL STATUTES

28 U.S.C. § 2254 ..................................................................................... 27, 66

28 U.S.C. § 2254(d)(1) .............................................................................. 27, 30

Antiterrorism and Effective Death Penalty Act of 1996 .............................. 27, 36, 40, 61

### STATE STATUTES

CPL 200.40(1) ............................................................................................................... 61

CPL 310.30 ................................................................................................................... 49

NY CJI2d ................................................................................................................... 42-43

Penal Law § 20.00 ..................................................................................................... 43-46

Penal Law § 125.25(3) .................................................................................................... 1

Penal Law § 160.1(1) ...................................................................................................... 1

Penal Law § 160.15(1) .................................................................................................... 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEITH STOKES,

                Petitioner,             18-CV-3637 (JMF)

        -against-

JAMIE LAMANNA, Supt.,

                Respondent.

---

## MEMORANDUM OF LAW IN SUPPORT OF ANSWER OPPOSING PETITION FOR A WRIT OF HABEAS CORPUS

### INTRODUCTION

This Memorandum of Law is submitted in support of Respondent's Answer opposing the petition for a writ of habeas corpus filed by *pro se* petitioner Keith Stokes. Petitioner seeks release from custody under a May 1, 2014 judgment of the Supreme Court, New York County (Juan Merchan, J.); by that judgment, petitioner was convicted, after a jury trial, of Murder in the Second Degree (New York State Penal Law ["Penal Law"] § 125.25[3]), Robbery in the First Degree (Penal Law § 160.15[1]), and Robbery in the Second Degree (Penal Law § 160.10[1]). The court sentenced petitioner to three concurrent terms of from twenty-five years to life in prison.

On January 27, 2013, petitioner and his brother Ralph Stokes robbed and brutally murdered forty-seven-year-old Charles Romo in his Manhattan apartment. The

brothers and their girlfriends were desperate for money to buy heroin. Having previously visited the apartment, Ralph descended on it first and after about an hour was joined by petitioner. Together, the brothers occupied Romo's apartment for thirty-five or forty minutes, during which they savagely bound, gagged, tortured and beat Romo, repeatedly fracturing his skull. After making a hasty effort to clean up the crime scene, petitioner and his brother helped themselves to Romo's computer, iPhone, jewelry, bank card, and other belongings. As they left the building with their plunder, Romo lay at the foot of his blood-stained bed, dead.

Petitioner, Ralph, and Ralph's then-girlfriend Shaquanna Doughty, who had been waiting outside on the street, fled the area in a cab. As they rode away, Doughty saw that petitioner had blood on his hands and clothing, and that petitioner's hand was injured. When Doughty asked about petitioner's hand, petitioner exclaimed, "That mother fucker wouldn't shut up. I had to punch him so fucking hard that I busted his ear." And indeed, as revealed by the subsequent autopsy, a large laceration had essentially ripped Romo's left ear in half.

The police arrested petitioner several weeks later on February 15, 2013. By then, they had reviewed surveillance footage from the victim's building and additionally had determined that a thumb print lifted from a coffee mug next to Romo's bed matched Ralph. Early in the morning on February 15, the police apprehended Ralph and Doughty. Doughty implicated defendant in the crime, and, later that day, the police

apprehended petitioner and his girlfriend Bridgette Cash.  Subsequent testing showed that a blood stain on the door of Romo's refrigerator contained petitioner's DNA.

By New York County Indictment Number 724/2013, filed on March 13, 2013, petitioner and Ralph were charged with Murder in the Second Degree (felony murder), Robbery in the First Degree (caused serious physical injury), and Robbery in the Second Degree (aided by another).  On March 20, 2014, petitioner and Ralph proceeded to trial before Justice Merchan and a jury.  On April 15, 2014, the jury returned its verdict, convicting petitioner, as well as Ralph, on all counts.  On May 1, 2014, the court sentenced petitioner as set forth above.[1]

Petitioner appealed to the Appellate Division of the Supreme Court of the State of New York, First Department ("Appellate Division").  On April 13, 2017, a unanimous panel of that Court affirmed petitioner's conviction.  *People v. Stokes*, 149 A.D.3d 510 (1st Dept. 2017).  Petitioner sought  leave to pursue a further appeal to the New York Court of Appeals, but, on June 26, 2017, that application was denied.  *People v. Stokes*, 29 N.Y.3d 1087 (2017).

---

[1] Ralph was sentenced, also on May 1, 2014, to concurrent terms of twenty-five years to life in prison on the murder count, twenty-five years in prison on the first-degree robbery count, and fifteen years in prison on the second-degree robbery count.

The girlfriends Doughty and Cash were separately charged with lesser crimes.  On February 20, 2013, Doughty pled guilty to Robbery in the First Degree.  On August 20, 2014, Doughty withdrew that plea and pled guilty to Attempted Robbery in the First Degree for which she was sentenced to five years in prison.  The charges against Cash ultimately were dismissed.

On or about April 18, 2018, petitioner filed a *pro se* petition for a writ of habeas corpus, which essentially repeats three of the four claims the Appellate Division unanimously rejected.   In particular, petitioner contends: (1) that the trial court improperly denied his eve-of-trial request for new counsel; (2) that the trial court did not properly respond to a jury note; and (3) that the trial court should have severed his trial from the trial of his brother.   For the reasons detailed below, petitioner's claims do not warrant relief.

<u>THE EVIDENCE AT TRIAL</u>

<u>The State's Case</u>

**Days before his scheduled return to his hometown, Charles Romo is found dead in his Manhattan apartment.**

Charles Romo was born and raised in Houston, Texas, and, as of January 2013, had lived in the New York City area for about thirteen years (ANTONIA ROMO [Romo's mother]: 161-63).   A gay man who suffered from AIDS and periodic depression, and who was legally blind in one eye, Romo had decided to move back to Houston to be near family.   He had bought tickets to return to Houston on February 3, 2013 (Romo: 164-67).   But at about 10 a.m. on Monday, January 28, 2013, NAOMI PORCENAT, who regularly cleaned Romo's apartment, 2K, at 87 Hamilton Place in Manhattan, found him lying on the floor of his bedroom with his head against the foot of his blood-stained bed (Porcenat: 48, 53, 56, 60-61).   When Officer XAVIER

REYNOSO arrived at the apartment in response to the resulting radio call, two paramedics already at the scene pronounced Romo dead (Reynoso: 68-72).

**Four days earlier, codefendant Ralph Stokes had been at Romo's building.**

At about 11:15 p.m. on January 24, 2013, codefendant Ralph Stokes ("Ralph"), the then-boyfriend of SHAQUANNA DOUGHTY, got out of a cab in front of 87 Hamilton Place and was let into the building by Joshua Moyer (Doughty: 581).[2]  Ralph and Moyer walked together down the hall and up the stairwell on the left, which led to the second floor where Romo lived (WARREN SELL [media services technician for District Attorney's Office]: 155-56).  VALDEVINO RIBEIRO, a friend of Romo's, had seen Moyer at Romo's apartment three times earlier that week, and believed that Romo and Moyer were engaged in a drug-related dispute over money (Ribeiro: 505-06, 508-11, 520, 521-22).  Doughty had met Moyer, who she believed was gay, and was concerned about the nature of his relationship with Ralph (Doughty: 575-78, 819-22); Ralph regularly spoke with Moyer on the phone,[3] related that Moyer gave him money

---

[2] The seven-story building at 87 Hamilton Place, where ALCANALLES LIRIANO was the superintendent, was equipped with a total of thirteen surveillance cameras, including two in the front of the building, three in the lobby, and one showing the hall leading to the elevators (Liriano: 100-01).  There were no surveillance cameras on the second floor (Liriano: 101).  MICHAEL MANNION, from the District Attorney's Office's Video Evidence Unit, retrieved footage from the surveillance system for the period from January 23 to January 30, 2013 (Mannion: 125-27, 132).  STEVEN KARDIAN, a forensic video technician from the District Attorney's Office, created compilations of clips from the video footage, which corrected the inaccurate date and time on the original footage (Kardian: 138-41).

[3] The evidence included call detail records for cell phones registered to Joshua Moyer (Stipulation: 949-50) and Ralph (HENRY ENRIGHT [custodian of records]: 938; Stipulation:
(Continued…)

for drugs, and told Doughty about places he and Moyer had been together, including the home of "a Caucasian male" who "had nice things" such as "a touch screen computer" (Doughty: 578-79).

**Romo still was alive the evening before his body was found.**

Romo spent much of Sunday, January 27, 2013, at his apartment with three men, including RICHARD LaFRANCE, with whom he had connected that morning on a website for gay men (LaFrance: 428-29).  LaFrance and a second man arrived at the apartment at about 7:30 a.m., and the fourth man, Richard, arrived about an hour later (LaFrance: 433-38, 443, 449-50).  The men met for "party and play," which "involve[d] crystal meth and sex" (LaFrance: 432).

At one point during the day, Romo texted Ribeiro "about" Moyer (Ribeiro: 512; HENRY ENRIGHT [custodian of records]: 921, 928-3; Stipulation: 948 [number for Ribeiro's phone]; Freeman: 1114-19).  At 5:51 p.m., LaFrance and the two other guests left (LaFrance: 441, 455-56).  Romo "said he was expecting somebody" and was still in his underwear (LaFrance: 441, 458).

**Desperate for money to buy heroin, Ralph and petitioner descend on Romo's apartment.  While they are inside, Romo's neighbor hears cries for help and loud noises, which she mistakenly reports originated from the floor below.**

That evening, Ralph took a train from Mohegan Lake, where he worked as a chef at a Phoenix House residential facility for adolescents, to Manhattan;  at 10:07 p.m., his

---

947), as well as text messages from Ralph's phone (Detective RICHARD McNAMARA [from the Computer Crime Squad]: 1163, 1172, 1177).

phone transmitted from a cell site near 1980 Park Avenue in the Lincoln Houses project, where he went to meet his then-girlfriend Doughty (Doughty: 564-65, 571, 586-88; NATHAN WEBER [cell site analyst for the District Attorney's Office] 1233; State's Exhibit ["SX"] 44, 45A [maps of cell site activity]). The two had met at the Phoenix House residential drug treatment facility in Long Island City, Queens (Doughty: 565-66, 569, 745). They had reconnected following their release and had started spending a lot of time together in October 2012, at which point Doughty was using drugs "[n]on-stop," including heroin, and was engaging in prostitution to make money (Doughty: 568-70, 818-19).

Doughty was well-acquainted with petitioner, who was Ralph's brother (Doughty: 571). She and Ralph spent a lot of time doing drugs with petitioner and his girlfriend Bridgette Cash (Doughty: 572). Doughty considered petitioner a "con artist" and characterized her relationship with him as one of "love and hate." Nonetheless on January 27, 2013, petitioner and Cash were staying with Doughty at 1980 Park Avenue in apartment 11C (Doughty: 571-72, 588-89, 835-37). Doughty paid a friend to be allowed to use the apartment to "do" crack cocaine and had used crack that night (Doughty: 826-28). Petitioner, Cash, and Doughty were at the apartment when Ralph arrived and Doughty told him that she was low on drugs and did not have any money (Doughty: 588-89). All four "were dope sick" from lack of heroin (Doughty: 590).

After Doughty unsuccessfully tried to find a "date," Ralph indicated that he had a plan and told Doughty to go with him (Doughty: 589-90, 769). Petitioner was not in

the room at the time, but had personally voiced how much they all "need[ed] some dope" (Doughty: 590-91).  Ralph and Doughty took a livery cab to 141st Street and Hamilton Avenue (Doughty: 591-93).  On the way, Ralph told Doughty only that she should wait in the cab while he briefly went upstairs (Doughty: 592-93, 603).

When they arrived at the building that Doughty later learned was 87 Hamilton Avenue, Ralph took out his cell phone (Doughty: 595, 603).  At 10:14 p.m., Ralph's phone started activating a cell site near 87 Hamilton Place (Weber: 1233).  At about 10:15 p.m., while still holding the phone to his ear, Ralph opened the outer door (which could be jimmied open), entered the building, walked down the hall and doubled back to go up the stairs on the left (Sell: 153; Ribeiro: 506-07; Doughty: 657).  Records showed two calls from Ralph's phone to Moyer's phone, at about 10:14 p.m. and 10:19 p.m., lasting fifty-three seconds, and two minutes and twenty-five seconds respectively (SX 40 [call detail records for Ralph's phone]; SX 23 [chronological chart of calls and texts to and from petitioner's and Ralph's phones between 7:02 a.m. on January 27, 2013 and 12:15 p.m. on January 28, 2013]).

At 10:25 p.m., Ralph came back downstairs, no longer wearing his coat, with money in his hand (Doughty: 595, 657-58).  He gave Doughty $20 to pay the cab fare, and told her to go back to the Lincoln Houses and wait for him there (Doughty: 595-97, 811).

When Doughty returned to apartment 11C at 1980 Park Avenue, having used the change from the $20 to buy some crack, petitioner reiterated that he needed drugs

and asked where Ralph was (Doughty: 597-98).  Doughty told petitioner to call Ralph himself (Doughty: 598).  The next time Doughty saw petitioner, he was holding his phone and said that Ralph wanted her to bring petitioner to him (Doughty: 598-99, 853-54).  Phone records showed a call at 11:04 p.m. from Ralph's phone to petitioner's phone, lasting slightly over two minutes (Stipulation: 949 [petitioner's phone number]; SX 40 [call detail records for Ralph's phone]; SX 42 [call detail records for petitioner's phone]; SX 23 [chart summarizing phone activity]).  Before leaving the apartment with Doughty, petitioner dressed all in black (Doughty: 600).[4]

Petitioner and Doughty took a cab back to 141st Street and Hamilton Avenue (Doughty: 600).  On the way, petitioner asked for, and Doughty gave him, one of the two pairs of gloves Doughty was wearing (Doughty: 601, 855-56).  Petitioner also kept talking on his cell phone, asking for directions (Doughty: 574, 601).  Records showed a call at 11:13 p.m., from petitioner's phone to Ralph's phone, lasting slightly over three minutes (SX 23 [chart]).  When the cab reached 87 Hamilton Place, petitioner directed the driver to go past the building (Doughty: 601, 603).  Petitioner got out, instructed Doughty to hold the cab, and doubled back to the building (Doughty: 601-02).  At 11:23 p.m., petitioner's phone made a call to Ralph's phone, which lasted forty-two seconds

---

[4] A January 21, 2013 message from Ralph to his daughter Melissa, which was included in Defense Exhibit G, offered by petitioner, stated, "Yo, your uncle got jumped in Coney Island, four dudes, B said he's in bad shape.  I'm going out there Tuesday" (McNamara: 1219).  Petitioner offered the text message as relevant to Ralph's state of mind on January 27, stating that it showed that Ralph knew that petitioner was in a compromised physical state (*see* 1195-96, 1199, 1212).

(SX 23 [chart]).  Petitioner's phone now also activated a cell site near 87 Hamilton Place (SX 44).  At 11:24 p.m., Ralph came downstairs and opened the building's front door, and, at 11:25 p.m., petitioner entered the building (Doughty: 659-60, 871-72).

After about ten minutes of waiting, the driver kicked Doughty out of the cab (Doughty: 609).  Doughty unsuccessfully tried to call Ralph and petitioner on a passerby's cell phone (Doughty: 610, 613).  At about 11:48 p.m., she saw a police car "pull up" in front of the building (Doughty: 610, 614-15).  Doughty thought the police might be responding to yelling and arguing she had heard and thought might have come from a first-floor apartment, where she had seen two figures in a window (Doughty: 611, 613-14, 856-60).

Shortly before, at about 11:45 p.m., EMILY LOUIS DAINES, who resided next door to Romo in apartment 2H, "all the way to the back" of the building, had heard noises that prompted her to call 911 (Daines: 463, 465, 467-68).  Daines was in the bathtub reading a book when she heard the building's front door slam and then heard "a distinct noise," like "help me" or "stop it," accompanied by "several loud noises" (Daines: 465-66).  After that, she heard "another thud" (Daines: 469).  Daines's bathroom shared a wall with Romo's bedroom (Daines: 463-64, 466).  But based on "[t]he way sound carried in that building," Daines believed, and conveyed in the 911 call, that the sounds came from the first floor (Daines: 466-67, 472).

16

**Petitioner and Ralph flee with Romo's property.  Doughty sees blood on petitioner's clothing and that petitioner's hand is injured.  In response to her inquiry, petitioner tells Doughty that he injured his hand when he "busted" a man's ear.**

At about 11:48 p.m., Officer THEODORE STEIXNER and his partner responded to the resulting radio run regarding what the dispatcher reported as "a family dispute" in apartment 1H (Steixner: 475-77; Doughty: 661).  No one answered when they knocked on the door of that and several nearby apartments (Steixner: 477-78).  At 11:54 p.m., the police left the building (Doughty: 661) and returned to their parked patrol car, where they sat outside for another ten minutes doing paperwork (Steixner: 478-79).

Meanwhile, Doughty became "nervous" when she saw the police at the building and ran around the block until she found a pay phone on the corner of 139th Street and Broadway (Doughty: 611, 615-16, 653).  Using seventy-five cents she managed to panhandle, Doughty reached Ralph when he answered petitioner's phone (Doughty: 611-12).  Records showed that, at 11:57 p.m., a call that lasted slightly over two minutes was made to petitioner's phone from the pay phone (Stipulation: 947 [number for pay phone]; Freeman: 1125-26; SX 23 [chart]).  Over the phone, Doughty told Ralph, "Pop, the police outside" (Doughty: 612).  Ralph sent Doughty to check whether the police still were there, but by the time she ran back to the pay phone to report that they were, the call had disconnected (Doughty: 612, 617-18).  Doughty nervously "walk[ed] back

and forth" on Amsterdam Avenue, between 140th and 141st Streets, "praying . . . [t]hat my papa don't go to jail for whatever he's up there doing" (Doughty: 612, 619).

Altogether, Ralph's phone activated a cell site near 87 Hamilton Place fourteen times between 10:14 p.m. and 11:44 p.m. that night (Weber: 1233; SX 44). The cell site that Ralph's phone activated was the same one Romo's phone – from the same company – repeatedly had activated that day (Weber: 1240). Petitioner's phone, which was from a different carrier, activated another cell site near 87 Hamilton Place four times between 11:23 p.m. and 11:57 p.m. (Weber: 1233, 1235; SX 44).

At about 12:05 a.m. on January 28, petitioner came down the stairs of 87 Hamilton Place to the first floor; Ralph soon followed, carrying a large mesh bag with objects inside (Doughty: 661-62). At 12:06 a.m., petitioner looked out the front door as if to check whether the coast was clear; he waited briefly until the police car drove away and then exited the building, followed by Ralph (Doughty: 662). Surveillance footage from the building at 505 West 141st Street captured petitioner and Ralph rounding the corner onto 141st Street (Kardian: 143-44; Doughty: 664-65). When Doughty turned around near the corner of 141st Street and Amsterdam Avenue, she saw Ralph "standing in the middle of the street with a bag in his hand," trying to hail a cab (Doughty: 619, 623, 655, 665). The only object Doughty could discern inside the bag was a "big" computer screen (Doughty: 619-20, 623, 631). On top of the bag, Doughty saw "red stuff" that appeared to be blood (Doughty: 623; *see* 968-69).

Doughty, Ralph, and petitioner eventually hailed a cab (Doughty: 620, 624-26, 628, 650, 655-56).  As they settled inside, Doughty noticed that petitioner – but not Ralph – had "wet," "dark red stuff" – again apparently blood – on his hands, sweater and pants (Doughty: 624, 626-27, 860-61, 968, 980).  Ralph looked "like a deer [in the] headlights," while petitioner "was more hyper" (Doughty: 621).  Doughty asked petitioner, who was not wearing the gloves Doughty had given him earlier, what had happened to his hand, which was "busted open," with petitioner's "knuckle . . . lifted up off his skin" (Doughty: 621, 627, 629).  Petitioner complained that his hand hurt and responded, "That motherfucker wouldn't shut up.  I had to punch him so fucking hard that I busted his ear" (Doughty: 621, 627-28, 869).

**Petitioner's girlfriend unsuccessfully tries to use Romo's bank card.  Petitioner and Ralph use Romo's other property to obtain money and then decamp with their respective girlfriends to a hotel.**

In the cab back to the Lincoln Houses, petitioner "pull[ed] out a "bank card" and asked, "[D]o you remember what he said the numbers was?" (Doughty: 621-22, 628-29).  Ralph did not respond (Doughty: 622).  Petitioner also took money from the bag to pay for the cab (Doughty: 628).

Back at the apartment at 1980 Park Avenue, petitioner "immediately" changed his clothes (Doughty: 634).  Petitioner gave his girlfriend Cash a watch from the bag. Then Doughty and Cash went to a room in the back (Doughty: 622, 629-31).  After a time, Ralph went to the back room and said that he would be going "to get some money" (Doughty: 629-30, 632, 634).  He hugged Doughty, who was having "an anxiety

attack," and gave Cash money and crack to "calm" Doughty down (Doughty: 630). When Doughty emerged from the back room, Ralph and petitioner both were gone, as were the contents of the bag except for the computer screen (Doughty: 633-34).

Later, petitioner and Ralph returned to the apartment with money. Ralph told Doughty he had "only" $600 or $700, and petitioner "really flashed" his money (Doughty: 635-36). Petitioner, Ralph, and their girlfriends left the apartment to go to a hotel (Doughty: 630, 636). They left the computer screen behind (Doughty: 636).

As Doughty and Ralph stood on the corner trying to hail a cab, Cash repeatedly inserted a bank card into an ATM by a closed deli, to no avail (Doughty: 630-31, 640-43). Doughty "snatched" the card from Cash, inserted it into the ATM herself, and told Cash to put in the PIN number, but the card still did not work (Doughty: 630-31, 642-43). When Doughty handed the card back to Cash, she noticed the name "Romo" on it (Doughty: 630, 643). Bank records confirmed that, at 2:22 a.m. on January 28, 2013, someone using an invalid pin number unsuccessfully attempted to use Romo's debit card to withdraw $200 from an ATM machine at 2095 Madison Avenue (Stipulation: 1079-80).

The two couples took a cab to the Ebony Hotel at 112th Street, where they got separate rooms (Dubose: 355; Doughty: 643-44). Within hours, Ralph left the hotel to go back "upstate" (Doughty: 644-45). By 7:37 a.m., Ralph's phone again was activating a cell site near the Phoenix House in Mohegan Lake (Weber: 1239). Romo's phone

activated the same cell site near Mohegan Lake at 12:15 p.m. on January 28 (Weber: 1240-41, 1245).[5]

Despite her inquiries, Ralph never told Doughty what had occurred at 87 Hamilton Place (Doughty: 646-47).

**The police investigate the bloody, ransacked crime scene.**

Meanwhile, investigating police, including Detectives HERBERT DUBOSE and SAMUEL GILFORD, converged on Romo's apartment (Dubose: 339, 373; Gilford: 266, 270, 288). The detectives saw Romo's body, taped and tied up, laying up against the end of the bed in a kneeling position (Gilford: 275; Dubose: 340). The apartment "was in disarray," with blood throughout (Dubose: 339-40; Gilford: 266, 270-72, 288).

In the bedroom, most of the dresser drawers had been pulled open, and blood was on the drawers, mattress, items lying on the bed, and a comforter on the floor (Gilford: 276, 287). The items on the bed included an empty pocketbook, empty jewelry cases, a fork, and the base of a lamp (Gilford: 286-87; Dubose: 342). Broken glass from the lamp, including one large piece of broken glass, lay on the floor next to the bed (Gilford: 287, 290). The bottom of the lamp "had a high concentrate of blood on it" (Gilford: 290). Detective Dubose believed that the lamp had been used as "the weapon" during the crime (Dubose: 341-42).

---

[5] One day during the ensuing weeks, when Doughty and Ralph again were low on money for heroin, Ralph brought the computer screen that had been left behind in the Lincoln Houses apartment to a pawnshop (Doughty: 646).

A t-shirt on the living room sofa and an empty iPad box in the storage room also appeared to have blood on them (Gilford: 277).  Other places where the police saw blood included the floors of the kitchen and bathroom, the wall by the kitchen sink, and by the handle of the refrigerator (Gilford: 276, 279-80).

The apartment was dotted with cleaning products, which appeared to have come from a cabinet under the kitchen sink (Gifford: 280-82).  A Clorox bottle with some liquid still inside lay on the bed (Gilford: 285-86).

The detectives unsuccessfully searched the apartment for objects such as a cell phone, an iPad, and a computer, which Romo's cleaning person Personat remembered Romo kept on a "little table" in the living room (Porcenat: 51; Dubose: 351-52).  The police also did not find any cash in the apartment (Dubose: 352).

That night and during a subsequent search on March 5, the Crime Scene Unit recovered numerous objects and swabs from the apartment for fingerprint and DNA testing (Gilford: 288-97, 302-07; Dubose: 347-51).  In addition, the Crime Scene Unit lifted four possible latent fingerprints, including one from a coffee cup on a table next to Romo's bed (Gilford: 298-99).  Subsequent analysis showed that the print from the mug matched Ralph (Detective JAMES MALONEY: 1092-99).

**The autopsy shows that Romo was savagely attacked.**

On January 29 and 30, 2013, Dr. RACHEL GIRARD of the Office of the Chief Medical Examiner conducted an autopsy on Romo (Girard: 172-73, 176, 235).  Dr.

Girard concluded that the cause of Romo's death was blunt impact injuries to the head together with asphyxia due to airway obstruction (Girard: 195, 232).

Romo was five feet nine inches tall and weighed 133 pounds (Girard: 178).  He was wearing a white t-shirt and gray underwear with discoloration in the area covering the buttocks, which Dr. Girard concluded "was from some kind of bleach type substance" (Girard: 176-78, 230).  Clear plastic tape had been wrapped multiple times around Romo's neck and mouth, partially obstructing his nose, and around his right hand (Girard: 176, 198).  Romo's wrists were bound behind his back with a brown scarf that was tied so tightly with multiple knots that there was bleeding under the skin (Girard: 176-77, 199).  Romo's ankles were bound "in a figure-eight style" with what looked like "a multicolored dog leash," "mixed with a brown leather belt" (Girard: 177, 200).

The autopsy showed that Romo had multiple blunt impact injuries to his head, torso, and extremities (Girard: 178-79, 189, 235-36).  Dr. Girard believed that Romo was subjected to at least forty separate applications of blunt force to the head and face (Girard: 190).  Romo sustained at least thirty-three lacerations on his face and scalp, including some that ripped away the skin, exposing the underlying bone and skull (Girard: 180-82).  It was "very unlikely" that a fist would have been forceful enough to break the skin of the scalp or would have caused the star-shaped lacerations Romo had sustained (Girard: 190-91, 238-39).  Another laceration to Romo's left ear was so large that it "actually rip[ped] the ear in half" (Girard: 181).  The "strong" force used against

Romo fractured his facial, frontal and temporal bones, as well as the skull itself, into multiple, tiny pieces (Girard: 183-84).  Pieces of bone went inward into the base of Romo's skull, "basically . . . touch[ed] the brain," and split the skull in half, causing "traumatic brain injury" (Girard: 184-85).

Dr. Girard also observed at least thirty abrasions of moderate severity to the deceased's arms, legs and buttocks area (Girard: 186-87, 191).  An injury on a one-inch area on the right lower buttocks consisted of four equidistant abrasions in a row, and could have been caused by a four-pronged object, such as a fork (Girard: 187, 193, 201).

Romo also sustained different chemical-type burns to the chin area, down the neck, to the chest and thighs, and also around his knees (Girard: 179, 188, 202).  In Dr. Girard's opinion, the various chemical burns were caused by the same substance that caused the discoloration of Romo's underwear (Girard: 193).  Dr. Girard believed that the chemical was applied around the time of Romo's death, but could not pinpoint whether that would have been before or after Romo died (Girard: 193).

Dr. Girard did not find any evidence of sexual activity (Girard: 203-04).  Toxicological examination of blood and urine samples showed that Romo had active methamphetamine in his system at the time of death, as well as a "substantial" amount of amphetamine, to which methamphetamine is converted (Girard: 205-06, 248-50).  The amount of the drug in Romo's body would not, however, have been lethal (Girard: 205).

**The police investigation continues and implicates petitioner and Ralph in the crime, leading to their arrests.**

Meanwhile, Detective GERARD DIMURO reviewed the surveillance footage and received information from the police department's latent print unit (Dimuro: 379-81, 386-89). Based on the combined information, Dimuro focused on Ralph as a possible suspect (Dimuro: 389). Dimuro left word with Ralph's common-law wife Stacey Grimes, obtained a phone number and related records for Ralph, and determined that Ralph lived and worked "upstate" at Phoenix House in Mohegan Lake (Dimuro: 389-91, 420).

On February 13, Ralph called Dimuro, who told him that the police were investigating "a homicide concerning Charles Romo" (Dimuro: 391-92). Ralph stated that he had been to Romo's home twice, accompanying Joshua Moyer, who delivered crystal meth to Romo and had argued with Romo over money (Dimuro: 392-93); Ralph claimed that each time he "stayed in the living room" (Dimuro: 392). Although Dimuro asked, Ralph declined to give him an address and phone number where he could be reached (Dimuro: 393). Ralph stated that he would come and talk with Dimuro when he next was in the city, but he never did so (Dimuro: 393).

On February 15, 2013, the police department's telecommunications unit traced Ralph's phone to the Ebony Hotel. The police went to the hotel and, at about 7:10 a.m., took Ralph and Doughty into custody (Dubose: 352-55; Dimuro: 395-97; Doughty: 665-67, 688, 692-93, 701).

Dimuro interviewed Doughty about the night of January 27 (Dimuro: 397-400; Doughty: 667-68).  After waiving her *Miranda* rights, Doughty provided two statements, which Dimuro reduced to writing (Dimuro: 399-400; Doughty: 672-73).  The first statement set forth a false narrative that Ralph and Doughty had gone to sell drugs to a "John" Doughty knew who lived on Hamilton Place (Doughty: 668-70; 710-13, 715).  Before the second statement, Doughty became nauseous, initiated a conversation with a woman detective, and decided to tell the truth (Doughty: 670-71).   When Doughty provided her truthful account, she had not seen or been told about any of the relevant surveillance videotapes and similarly was unaware of any other evidence (Doughty: 671-72).  All she knew was that somebody was dead (Doughty: 672, 980-81).

Based on Doughty's statements, petitioner also became a suspect in Romo's homicide (Dimuro: 399-400).  The police promptly apprehended petitioner and his girlfriend Cash at the Casablanca Hotel on 145th Street (Dubose: 356; Dimuro: 400-02).

The police took each brother's cell phone (Dubose: 359-61, 363-64).  According to their pedigree information, petitioner and Ralph each was six feet one inch tall and weighed about 200 pounds (Dubose: 357, 361).  During the arrest processing, Detective Dubose noted that petitioner had small scabs on his hands and knuckles (Dubose: 362).  Dimuro similarly noted that petitioner had some "chafing" or "discoloration" on his right hand (Dimuro: 409).

Meanwhile, Doughty still had not seen or been told about any evidence when a prosecutor later interviewed her on videotape (Dimuro: 410-12; Doughty: 673-75). Doughty again told the truth to the best of her ability (Doughty: 673). When Doughty asked at the end of the interview whether she would be charged with a crime, she was told that had not yet been determined (Dimuro: 410; Doughty: 675-76).

At about 9:30 p.m., Dubose and Dimuro interviewed Ralph, whose statement Dimuro reduced to writing (Dimuro: 402-07). Ralph said that he twice had accompanied Moyer to Romo's apartment, the last time in January, when Moyer delivered meth to Romo (Dimuro: 408, 414). Ralph had spent time in both Romo's bedroom and living room, and could have left fingerprints on a cup from which he drank (Dimuro: 408, 414). Ralph further represented that he was upstate on both January 27 and 28, and did not return to Manhattan "until later in the week" (Dimuro: 408-09, 423).

Dimuro subsequently met with Moyer, whom he located at a men's shelter on 137th Street (Dimuro: 393-95). Dimuro brought Moyer to the District Attorney's Office for an interview, but then lost contact (Dimuro: 395). Moyer did not appear on the surveillance videotapes for 87 Hamilton Place between 6:00 p.m. on January 27, 2013 and 10:00 a.m. on January 28, 2013 (Detective VINCENT SAPORITO: 1104-05, 1110-11). And between 9:00 p.m. on January 27 and 3:00 p.m. on January 28, Moyer's

phone activated only one cell site, located east of Frederick Douglass Boulevard around 137th Street (Weber: 1242-43).[6]

**Doughty enters into a cooperation agreement, pursuant to which she testifies.**

The police took Doughty from the precinct to a hotel, where she remained for several nights under police supervision (Dimuro: 412-13; Doughty: 676-79).   On February 19, Doughty was brought to the District Attorney's Office and was told that she would be charged with first-degree robbery (Doughty: 679-80).   Before being formally arrested, Doughty agreed to enter into a cooperation agreement (Doughty: 525-26, 679-81, 788-91).

On February 20, Doughty pled guilty to first-degree robbery and signed the cooperation agreement (Doughty: 525, 681-82).  The agreement provided that Doughty would not be prosecuted for murder.  If Doughty satisfied her obligation to testify and tell the truth, she would be allowed to withdraw her guilty plea and re-plead to the lesser charge of attempted robbery in the first degree.  On the first-degree robbery charge, Doughty faced a sentence ranging from a minimum of eight years to a maximum of twenty-five years in prison; for attempted first-degree robbery, the possible sentences

---

[6] Between 10:00 p.m. on January 27 and 12:46 a.m. on January 28, there were a total of seventeen attempted communications between Ralph's and Moyer's phones (Freeman: 1133-34; *see* SX 23 [chart]).   Five of those calls resulted in spoken conversations of twenty-five seconds or longer, including the last call at 12:46 a.m., which lasted two minutes and thirty seconds (Freeman: 1134).

ranged from a minimum of five years to a maximum of fifteen years in prison (Doughty: 526-28, 788-91, 796-98).

Later on February 20, Doughty testified before the grand jury (Doughty: 682-83).  She may have "minimize[d]" her own role "[a] little bit," but she told the truth (Doughty: 683-84, 690-92).

After testifying before the grand jury, Doughty spent the next fourteen months in jail at Rikers Island (Doughty: 683-85).  Doughty testified at trial pursuant to the terms of the cooperation agreement (Doughty: 525).

**Forensic Evidence.**

As stated, subsequent analysis showed that the latent fingerprint recovered from the mug in Romo's bedroom matched Ralph (Maloney: 1092-99).  Other fingerprint analysis yielded no evidence (ALYNKA JEAN [Criminalist]: 881-84, 896-901; THOMAS CARBOY [Criminalist]: 903-18).  The wearing of gloves and use of cleaning products by the perpetrators would have adversely affected the ability of the police to recover fingerprint evidence (Gilford: 97-98; Jean: 893).

The use of bleach or other cleaning supplies also would have destroyed DNA evidence (CHRISTOPHER KAMNIK [Criminalist]: 987-88, 995-96).  None of the swabs collected and tested matched the DNA profile of Ralph (Stipulation: 1058-59, 1279-80).  On June 18, 2013, pursuant to court order, a buccal swab sample was taken from inside petitioner's cheek (Stipulation: 918-19).  Subsequent analysis showed that the swab of a blood stain from the top of Romo's refrigerator door contained a two-

person DNA mixture, for which the minor contributor matched Romo's DNA profile and the major contributor matched the DNA profile of petitioner (Kamnik: 1011-13, 1016-19, 1024, 1041-42, 1075).[7]

Petitioner's Case

Petitioner recalled Detective GERARD DIMURO, who testified that, in their phone conversation in February 2013, Ralph stated, without prompting, that he was not "gay" and did "not do drugs" (Dimuro:  1249-50, 1252).[8]

PETITIONER'S APPEAL TO THE APPELLATE DIVISION

On petitioner's appeal to the Appellate Division, Barbara Zolot, Esq., of the Center for Appellate Litigation, filed a seventy-page brief on petitioner's behalf (Exhibit ["Exh."] D).  The brief raised four claims: (1) that "[t]he trial court erred when it denied [petitioner's] application for new counsel without conducting any inquiry" (Exh. D p. 40); (2) that the court improperly gave a "hedged" "yes and no" response to the jury's inquiry whether a person could be guilty of robbery if he arrived after the victim had died (Exh. D p. 44); (3) that the court abused its discretion when it refused to sever petitioner's trial from the trial of Ralph, because "the core of each defense was in irreconcilable conflict with the other" (Exh. D p. 53); and (4) that a court officer's

---

[7] Neither Romo nor petitioner was a contributor to the DNA mixture of at least three persons found in a blood swab from Romo's kitchen counter wall adjacent to the sink (Kamnik: 1013-14, 1052-53, 1072).

[8] Ralph did not present any evidence at trial.

conversation with a sworn juror "who expressed safety-related concerns" usurped a judicial function and should have caused the court to make inquiry of the juror (Exh. D p. 61). For each claim, the brief cited the federal constitution, but otherwise relied on state law to support the argument.

The People submitted a seventy-six-page brief in response (Exh. E). Petitioner's counsel submitted a fourteen-page reply brief, which further addressed petitioner's claims challenging the response to the jury note and the court's denial of the severance motion (Exh. F).

The Appellate Division unanimously rejected petitioner's claims in a written opinion. *Stokes*, 149 A.D.3d 510. First, the Appellate Division held that the trial court "providently exercised its discretion in denying defendant's request for new counsel, which was made on the eve of trial, and in the context of a meritless request for a last-minute adjournment." *Id.* at 510. Citing *People v. Porto*, 16 N.Y.3d 93, 100 (2010), the state appellate court reasoned that petitioner had failed to allege the sort of "seemingly serious" complaint that required "a minimal inquiry." *Stokes*, 149 A.D.3d at 510. The Appellate Division elaborated that petitioner, "through counsel, expressed only a generalized complaint about the quality of counsel's representation," which "did not require further inquiry under all the circumstances." *Id.* at 510-11.

Next, the Appellate Division held that the trial court had satisfied its obligation to provide a "meaningful response" to the jury's inquiry. *Id.* at 511. The state appellate court explained that the relevant inquiry had "asked a legal question in a form that, in

the context of the case, was too abstract to answer." *Id.*  The opinion elaborated that,

"In essence, the court told the jury that its question was unanswerable as written, and

it invited the jury to ask a more specific question if it needed additional guidance." *Id.*

Additionally, the state appellate court stressed:

> The [trial] court had just responded to another portion of
> the same note by reinstructing the jury on the elements of
> the crimes and the concept of accessorial liability.  That
> instruction tended to provide guidance on the issue that
> appeared to have prompted the jury's abstract question, and
> the jury did not see fit to ask a clarifying question as the court
> had suggested.

*Id.*

The Appellate Division also held that the trial court had "providently denied

[petitioner's] severance motion." *Stokes*, 149 A.D.3d at 511.  Referencing the standard

set forth in *People v. Mahboubian*, 74 N.Y.2d 174, 184 (1989), the Appellate Division

determined that the defenses of petitioner and Ralph "were not in irreconcilable

conflict," and that "there was no significant danger that the conflict alone would lead

the jury to infer defendant's guilt." *Stokes*, 149 A.D.3d at 511 (quotation marks omitted).

The state appellate court elaborated, "Neither defendant acted as a second prosecutor

regarding the other defendant, and in their cross-examination of witnesses and

summations, neither defendant developed the inconsistency in their defenses to a point

where it created prejudice." *Id.*

Lastly, the Appellate Division rejected petitioner's claim regarding the juror both

on the procedural ground that it was unpreserved and, alternatively, on the merits.  *Id.*

HABEAS STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")
imposes a "highly deferential standard" for federal habeas review of state-court rulings
that uphold state criminal convictions. *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir.
2017). In particular, under 28 U.S.C. § 2254, a federal habeas court must defer to the
state court's legal determination of any matter "adjudicated on the merits," unless the
state court decision was "contrary to," or involved "an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court of the United
States," or "was based on an unreasonable determination of the facts." 28 U.S.C.
§ 2254(d)(1). And, even before passage of the AEDPA, it was established that "federal
habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991). The premise underlying the structure of federal habeas jurisdiction is
"that habeas corpus is a guard against extreme malfunctions in the state criminal justice
systems, not a substitute for ordinary error correction through appeal." *Harrington v.
Richter*, 562 U.S. 86, 102-03 (2011) (quotation marks and citation omitted).

Notably, the "contrary to" and "unreasonable application" clauses of §
2254(d)(1) have "independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under
the "contrary to" clause, a writ may issue if the state court "applies a rule different from
the governing law set forth in" United States Supreme Court cases, or if it decides a
case differently than the Supreme Court has done on a set of "materially

indistinguishable facts." *Bell*, 535 U.S. at 694; *see Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the "unreasonable application" clause, habeas relief is available if the state court "correctly identifies the governing legal principle" from the Supreme Court's decisions but "unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694; *see Williams*, 529 U.S. at 407-08.

At the same time, under both clauses, lower federal courts may not look to their own precedents to determine clearly established federal law; instead, they must look solely to Supreme Court precedents, as the statute requires. *See*, e.g., *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) ("circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'").  Further, "clearly established" law "includes only the holdings, as opposed to the dicta," of Supreme Court decisions. *Woods v. Donald,* 135 S. Ct. 1372, 1376 (2015) (internal quotations omitted).

Significantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101, quoting *Williams*, 529 U.S. at 410 (emphasis in the original).   To constitute an "unreasonable application" of Supreme Court holdings, the application must rise to the level of being "objectively unreasonable, not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014).  The test is not whether a habeas court would have resolved the relevant claim the same way under *de novo* review. *See Richter*, 562 U.S. at 102.  A state court's determination may not be deemed an "unreasonable application" of federal law unless the ruling "was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 102-03.

Moreover, "a habeas court must be guided by the level of specificity of the relevant precedent's holding." *Carmichael*, 848 F.3d at 544 (quotation marks and citation omitted). When the applicable rule is "more general," a state court possesses "more leeway . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *see Carmichael*, 848 F.3d at 544.

The Supreme Court has emphasized that, "[i]f this [habeas] standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. The "basic structure of federal habeas jurisdiction [is] designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Id.* at 103. Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101 (quotation marks and citation omitted).

<u>POINT I</u>

THE TRIAL COURT PROPERLY DENIED PETITIONER'S EVE-OF-TRIAL REQUEST TO SUBSTITUTE COUNSEL, AND PETITIONER'S CONTRARY CLAIM PROVIDES NO BASIS FOR HABEAS RELIEF.

The state appellate court's determination that the trial court "providently exercised its discretion in denying [petitioner's] request for new counsel," *Stokes*, 149 A.D.3d at 510, was neither contrary to, nor an unreasonable application of, established Federal law. 28 U.S.C. § 2254(d)(1). As the Appellate Division emphasized, petitioner requested new counsel only "on the eve of trial, and in the context of a meritless request for a last-minute adjournment." *Stokes*, 149 A.D.3d at 510. Further, the trial court's inquiry regarding the related adjournment request showed that there was no good reason to delay the trial, and the Appellate Division reasonably determined that petitioner's "generalized complaint about the quality of counsel's representation" "did not require further inquiry under all the circumstances." *Id.* at 510-11. Notably, while petitioner now focuses on trial counsel's asserted failure to properly investigate the defense of third-party culpability (Petition p. 8), his appellate counsel treated that complaint as relevant primarily to the request for an adjournment, which petitioner did not dispute was properly denied and which the Appellate Division appropriately deemed "meritless." *Id.* at 510. Thus, the Appellate Division's rejection of petitioner's right to counsel claim was entirely consistent with established federal law and provides no basis for habeas relief.

## A. The relevant record.

As stated, petitioner was arrested for the crimes at issue on February 15, 2013. More than a year later, on March 18, 2014, the case was sent out for hearings and trial (PT 1-3). The date had been agreed to "as a date certain" five months in advance, and the State had "lined up 30 witnesses" (PT 91).

Defense counsel stated that petitioner would have been "interested" in a disposition entailing a determinate sentence, but the prosecution was not offering one (PT 3-5). The parties and court then devoted the day to discussing various preliminary issues, including scheduling and the State's applications to present evidence of uncharged bad acts by the defendants either as part of the State's case in chief or to impeach the defendants if they testified (*see* PT 5-6, 37-55, 62-67, 70). The proceedings were adjourned to the following day (PT 82) without any hint of discord between petitioner and his counsel.

However, when the proceedings resumed the next day, petitioner's counsel stated that petitioner wanted an adjournment and new counsel, asserting:

> [Petitioner] has asked me to ask the Court for an adjournment. He believes that the defense in this case is not fully prepared to go forward, and he is seeking an adjournment. . . .
>
> * * *
>
> In addition, [petitioner] is asking that you relieve me as counsel as part of his request for an adjournment.

> He is dissatisfied with the representation that he has
> received, and he feels that I'm not working in his best
> interest, and he is asking for me to be removed

(PT 86-87).  The court asked why petitioner wanted an adjournment, and counsel

responded that petitioner had "advised" him that he "feels there is further investigation

that needs to be conducted, that he believes has not been conducted" (PT 87).  The

court sought more information, asking, "What kind of defense does he believe needs

to be investigated further, and what kind of issues does he believe need to be

addressed?" (PT 87).

After Ralph's counsel stated that the codefendant also wanted an adjournment

based on a "perceived lack of preparedness" (PT 87-88), the court inquired, "So what

are the additional defenses that they believe they can look into?" (PT 88).  Petitioner's

counsel stated that discovery material the People had disclosed "relatively recent[ly]"

included "a tremendous amount of video" that showed numerous people going into

and out of the building where the crime occurred (PT 89).  Counsel asserted that trying

"to figure out who those people are," as he had done, was "a lengthy and challenging

process" (*id.*).  Counsel continued, "Having said that, [petitioner] believes that an

adjournment would allow for additional time to investigate who committed this murder

and who might have had access to that building" (*id.*).

The prosecutor responded that the People had disclosed discovery material as it

became available and, in particular, had disclosed the "week's worth of video" from the

building three weeks before (PT 90)  So, too, the prosecutor stated, he had been "utterly

forthcoming about who people are on the video" (PT 90). Petitioner appeared to be arguing that the defense would not be prepared to go forward until all those on the video had been identified, but, the prosecutor submitted, that was "never going to happen" (PT 91). The prosecutor additionally noted that delay would be "incredibly disruptive" to the numerous witnesses, some from out of town, who had been scheduled to appear (*id.*).

The court clarified that the defense was not claiming any dereliction by the State (PT 92), but that it instead was "hearing . . . some sort of dissatisfaction from both defendants with regard to the quality of the representation" they were receiving (PT 93). The court noted that the claim was being made "literally on the eve of trial," and that petitioner's position was "tantamount" to saying, "I need to find out who actually committed this murder before we go forward" (*id.*). That position, the court remarked, was "absurd" (*id.*). The court elaborated that the defense had no "obligation . . . to come up with the name or an identity of someone else who might have committed this murder" (PT 94). The court continued, "If they can do it, that's fine. But that's not the standard" (*id.*). At the same time, the court stated, with the suppression hearing and jury selection still to come, opening statements were about a week away, which provided time "to conduct whatever additional investigation you want to conduct" and "to further prepare your defenses" (PT 94-95). Accordingly, the court ruled, no legitimate basis existed for granting an adjournment or relieving counsel, and it denied both requests (PT 95).

At no point during the ensuing hearings and trial did petitioner express any dissatisfaction with his counsel.

**B. The state appellate court's determination that the trial court properly exercised its discretion when it denied petitioner's last-minute request for new counsel was neither contrary to, nor an unreasonable application of, federal law.**

The Sixth Amendment right to counsel includes the right to effective counsel, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984), but does not entitle an indigent defendant to counsel of his choice, *United States v. Parker,* 469 F.3d 57, 62 (2d Cir. 2006); *see Wheat v. United States*, 486 U.S. 153, 159 (1988).  "A court need go no further than ensuring that each defendant has an 'effective advocate'." *Pizarro v. Bartlett,* 776 F. Supp. 815, 818 (S.D.N.Y. 1991), *quoting Wheat*, 486 U.S. at 159.  More particularly, trial courts are not required to act whenever a defendant expresses that he is dissatisfied with counsel; the Sixth Amendment does not guarantee that an accused and his counsel will have a "meaningful relationship."  *Morris v. Slappy*, 461 U.S. 1, 14 (1983).  To the contrary, courts possess "broad discretion" in ruling on requests for new counsel and related requests for continuances that would disrupt scheduled criminal trials.  *Id.* at 11.  "[O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel."  *Id.* at 11-12; *see United States v. Gonzalez-Lopez,* 548 U.S. 140, 152 (2006) ("We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, . . . and against the demands of its calendar").

New York law is consistent with those established principles.  Under New York law, an indigent defendant's constitutional right to counsel "does not encompass a right to appointment of successive lawyers at defendant's option."  *People v. Sides*, 75 N.Y.2d 822, 824 (1990); *see People v. Medina*, 44 N.Y.2d 199, 207 (1978).  To warrant a change of counsel, a defendant must show "'good cause for a substitution,' such as a conflict of interest or other irreconcilable conflict with counsel."  *Sides*, 75 N.Y.2d at 824 (citation omitted).  On the other hand, "good cause does not exist when defendants are guilty of delaying tactics or where, on the eve of trial, disagreements over trial strategy generate discord."  *People v. Linares*, 2 N.Y.3d 507, 511 (2004).  Whether to substitute counsel is a matter committed to the sound discretion of the trial court.  *See Medina*, 44 N.Y.2d at 207.

Further, under New York law, "a court's duty to consider . . . a motion [to substitute counsel] is invoked only where a defendant makes a 'seemingly serious request[]'."  *Porto*, 16 N.Y.3d at 99-100, *quoting Sides*, 75 N.Y.2d at 824 (stating that court should have conducted further inquiry after the defendant and his counsel agreed that there was a "complete breakdown of communication and lack of trust").  If a defendant "makes specific factual allegations of serious complaints about counsel," "the court must make at least a minimal inquiry" as to "the nature of the disagreement or its potential for resolution."  *Id.* at 100 (quotation marks and citations omitted).  At the same time, "patently meritless" complaints about counsel may be rejected without

additional inquiry. *E.g.*, *People v. Reed*, 35 A.D.3d 194, 194 (1st Dept. 2006), *citing People v. Beriguette*, 84 N.Y.2d 978, 980 (1994).

New York law thus mirrors the Second Circuit's formulation that a defendant is not entitled to new counsel on the eve of trial unless he demonstrates "good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972). The Circuit considers four factors in reviewing a trial court's exercise of discretion to deny a motion to substitute counsel: "(1) the timeliness of [the] defendant's request for new counsel; (2) the adequacy of the trial court's inquiry into the matter; (3) whether the conflict resulted in a total lack of communication between the defendant and his attorney; and (4) whether the defendant's own conduct contributed to [any] communication breakdown." *United States v. Careto*, 583 F.3d 152, 158 (2d Cir. 2009), *citing United States v. John Doe No. 1*, 272 F.3d 116, 122-23 (2d Cir. 2001). With specific respect to the adequacy of the inquiry, the Circuit has stated that trial courts should inquire into "seemingly substantial" complaints about counsel and, if reasons are provided, may rule without more; alternatively, "if the reasons proffered are insubstantial and the defendant received competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error." *John Doe No. 1*, 272 F.3d at 123, *citing McKee v. Harris*, 649 F.2d 927, 933-34 (2d Cir. 1981). The Second Circuit's formulation has been deemed "instructive" in applying the deferential AEDPA standard of review to a habeas petitioner's claim that he had a

constitutional right to substitute counsel. *Brown v. Griffin*, 13 CV 1352(AKH/FM), 2016 WL 4382668 at * 12 (S.D.N.Y. May 12, 2016).

Here, the last-minute timing of petitioner's request for new counsel implicated the court's strong interest in proceeding with the long-scheduled criminal trial. As the trial prosecutor stated, delay would have been "incredibly disruptive" to the numerous witnesses, some from out of town, who had been scheduled to appear (PT 91). The trial court had "broad discretion" to deny that disruptive request. *Slappy*, 461 U.S. at 11.

Further, the trial court's denial of petitioner's request for new counsel was neither "unreasoning" nor "arbitrary." *Slappy*, 461 U.S. at 11. Notably, nothing in the record before the trial court when defense counsel conveyed petitioner's related requests for new counsel and an adjournment so much as hinted at any "seemingly substantial," *John Doe No. 1*, 272 F.3d at 123, problem between petitioner and his lawyer. At no point during the prior day's proceedings addressing preliminary trial issues did petitioner or counsel betray any hint of discord between them. Further, counsel's initial statement as to why petitioner wanted new counsel was entirely generic. All counsel stated was that petitioner was "dissatisfied with the representation that he has received" and felt that counsel was "not working in his best interest" (PT 86-87). Before the Appellate Division, appellate counsel argued that trial counsel's statement "suggest[ed] a lack of trust and possible breakdown in [the attorney-client] relationship" (Exh. D p. 41). But, as the Appellate Division determined, the language raised only "a generalized complaint

about the quality of counsel's representation," *Stokes*, 149 A.D.3d at 510, which failed to warrant a last-minute substitution of counsel.

Indeed, the generalized complaint rang particularly hollow in this case, given that petitioner still was relying on counsel to advocate for him and that counsel himself expressed no qualms about continuing to represent petitioner.  Further, the ensuing colloquy between the court and trial counsel confirmed that petitioner's asserted dissatisfaction with counsel did not reflect any "seemingly substantial" problem that could constitute "good cause" for disrupting the scheduled trial to appoint new counsel.

More particularly, the trial court immediately inquired as to the reasons petitioner wanted an adjournment, and followed up with further inquiry regarding petitioner's professed belief that trial counsel was unprepared (*see* PT 87).  When counsel responded to the court's initial inquiry by stating that petitioner felt that "further investigation" needed to be conducted, the court requested "more information" as to the "kind of defense" petitioner believed needed to be investigated and the "kind of issues" petitioner believed needed to be addressed (PT 87).  After counsel for Ralph seconded the request for an adjournment based on a "perceived lack of preparedness," the court continued to pursue that inquiry, asking, "So what are the additional defenses that they believe they can look into?" (PT 88).

True, the court directed its inquiry at petitioner's counsel – who had advanced the requests for an adjournment and new counsel.  Petitioner complains that the court failed to make "any direct inquiry of petitioner" himself (Petition p. 8).  But no Supreme

44

Court precedent provides that inquiry of counsel may not suffice to warrant denial of an eve-of-trial request for new counsel as part of a meritless request for an adjournment. Nor, for that matter, has the Second Circuit differentiated for these purposes between inquiry of counsel and inquiry of the defendant personally.

Significantly, counsel's responses to the court's inquiry supported the court's determination that neither an adjournment nor substituted counsel was warranted. Counsel stated that petitioner believed the defense was unprepared to go to trial because the identity of many of the people seen on the surveillance video entering and leaving the building where the victim was killed remained unknown, and no alternative suspect had been identified. But by then the defense had had months since the parties had agreed to a "date certain" (PT 91) for hearings and trial to unearth a colorable alternative suspect. Additionally, as the prosecutor remarked, identifying all those on a week's worth of video was "never going to happen" (PT 91). Further, the court was correct that the standard for effective representation does not require that defense counsel identify alternative suspects (PT 94). At most, therefore, petitioner's dissatisfaction with counsel, if not an outright delaying tactic, reflected a disagreement over trial strategy, which did not rise to the level of "good cause" for a substitution. *See Calabro*, 467 F.2d at 987; *People v. Paulino*, 131 A.D.3d 65, 71 (1st Dept. 2015).

Put in terms of the Second Circuit's jurisprudence, to the extent petitioner advanced a "seemingly substantial" complaint about his counsel, the trial court made appropriate inquiry, which enabled it to rule and deny the request for new counsel

"without more." *John Doe No. 1*, 272 F.3d at 123.  In that regard, insofar as petitioner now focuses on trial counsel's asserted failure to conduct an "investigation into third-party culpability" (Petition p. 8), the trial court properly inquired into that complaint when it questioned trial counsel about petitioner's related request for an adjournment, and that inquiry belied the existence of any "seemingly substantial," *John Doe No. 1*, 272 F.3d at 123, problem in petitioner's relationship with trial counsel that might have impeded counsel's ability to effectively represent petitioner.  Alternatively, petitioner's dissatisfaction with his counsel – which entailed no suggestion of any breakdown in communication between them – provided an insubstantial basis for the substitution request, and, since even petitioner does not deny that he received competent representation at trial, any deficiency in the court's inquiry into the request constituted harmless error.  *Id.*

Most significantly, the denial of petitioner's last-minute request for substituted counsel was consistent with the "broad discretion" contemplated by *Slappy*, 461 U.S. at 11, to deny requests that would interfere with previously-scheduled criminal trials.  And because the *Slappy* precedent sets forth a "more general" rule, the state appellate court possessed "more leeway" in reaching the particular outcome upholding the trial court's denial of petitioner's request for new counsel as a provident exercise of discretion. *Yarborough*, 541 U.S. at 664; *see Carmichael*, 848 F.3d at 544.  The state appellate court's determination was a reasonable application of established federal law and is entitled to deference under the AEDPA.

\*\*\*

In sum, no legitimate basis exists to set aside the state appellate court's determination that the trial court providently exercised its discretion when it denied petitioner's eve-of-trial request for new counsel.

## POINT II

THE APPELLATE DIVISION PROPERLY DETERMINED THAT THE DISPUTED SUPPLEMENTAL INSTRUCTION CONSTITUTED A "MEANINGFUL RESPONSE" TO AN "ABSTRACT" INQUIRY FROM THE JURY, AND THE INSTRUCTION AFFORDS NO BASIS FOR HABEAS RELIEF.

As the Appellate Division stated, one inquiry from the deliberating jury "asked a legal question in a form that, in the context of the case, was too abstract to answer." *Stokes*, 149 A.D.3d at 511. The question posed was, "If a victim were deceased prior to arrival, could a person be guilty of robbery in the second degree?" (1543). Even the writer recognized that the court might have difficulty responding, adding the parenthetical, "if you can answer this[?]" (1543). After extended discussion with the lawyers for both sides, the judge instructed the jurors, in part, "[T]he answer to that question is both yes and no, depending upon the facts as you find them to be and depending upon how you apply those facts to the law as I have given it to you" (1559). Petitioner contends that that response denied him a fair trial (Petition Ground Two, p. 8). But petitioner's contention is unavailing.

The Appellate Division appropriately viewed the language that petitioner deems problematic together with the balance of the court's response to the pertinent inquiry, as well as in the context of the immediately preceding supplemental instruction, which "tended to provide guidance on the issue that appeared to have prompted the jury's abstract question." *Stokes*, 149 A.D.3d at 511.  So viewed, the Appellate Division determined, the trial court "provided a meaningful response" to the jury's "abstract," essentially "unanswerable" inquiry, and the response caused "no prejudice to [petitioner]." *Id.*  That determination by the state appellate court was entirely reasonable and certainly neither contrary to nor an unreasonable application of federal law, and the disputed supplemental instruction provides no basis for habeas relief.

## A. The relevant record.

In its final instructions, the court gave the recommended charge on the State's burden to prove a defendant's guilt beyond a reasonable doubt (*see* 1497-1500; NY CJI2d [Burden of proof and proof beyond a reasonable doubt]), including that the standard required "no reasonable doubt of the existence of any element of the crime or of the defendant's identity as the person who committed the crime" (1499).  Then, at the outset of its discussion of the law applicable to the charged offenses, the court discussed in detail, and in full accord with the pattern jury instructions, the concept of accomplice liability (*see* 1507-09; NY CJI2d [Accessorial liability]).  The court explained that accomplice liability required a two-fold showing: (1) that the defendant "solicited, requested, commanded, importuned, or intentionally aided" the other person "to

engage in th[e] [unlawful] conduct, and (2) "that he did so with the state of mind required for the commission of the offense" (1508).

The court also separately discussed all three charged offenses (1509-15).  First, the court defined the crime of felony murder and stated that the predicate felony in this case was "robbery" (1509-10).  Immediately, the court stated that robbery was defined as "forcible stealing" and explained the terms "steals," "larceny," and "forcibly steals" (1510).  In accordance with the standard CJI instruction, the court stated that, to steal and commit larceny, a defendant had to act "with the intent to deprive another of property, or to appropriate the property to himself or to a third person" (1510; see NY CJI2d [Introductory charge to robbery]).

The court repeatedly instructed that the elements of the charged offenses required conduct committed by the defendant "personally or by acting in concert." Thus, the court stated that the crime of felony murder consisted of two elements: (1) that a defendant "personally or by acting in concert, committed or attempted to commit robbery," and (2) that "in the course of and in furtherance of" that offense, a defendant "personally or by acting in concert caused [Romo's] death" (1511).  *See* Penal Law § 20.00.  The court similarly instructed that the first-degree and second-degree robbery charges required proof that a defendant "personally or by acting in concert, forcibly stole property from Charles Romo" (1513, 1514-15).

The instructions additionally addressed the aggravating element of the second-degree robbery charge – *i.e.*, "aided by another person actually present" (1514).  Again

49

following the pattern jury instruction, the court explained that "[a] person is actually present when such person is in a position to render immediate assistance to a person participating in the robbery and is ready, willing, and able to do so" (1514).

Neither petitioner nor Ralph excepted to the final instructions (1523).

On the morning of the second day of deliberations, the jury sent the court a three-part note. The first two inquiries requested that the court (1) "review all charges again and instructions," and "explain acting in concert"; and (2) "[i]f possible, explain the difference between guilty beyond all doubt and guilty beyond a reasonable doubt" (1542). The third inquiry – which is the focus of petitioner's claim – asked, "If a victim were deceased prior to arrival, could a person be guilty of robbery in the second degree? (if you can answer this)." The parties agreed that the court should respond to the first two questions by rereading the relevant instructions from the main charge (1542-43). The third question generated discussion.

Initially, the judge commented that he believed the jurors "meant to write murder" rather than "robbery" (1543). Petitioner's counsel disagreed, stating that robbery "would be the predicate for the felony murder" (*id.*). The prosecutor commented that the question was "a little tricky to answer," because it was "vague" (*id.*). He surmised that the jurors might be contemplating "the fact pattern" proposed in petitioner's summation – that petitioner arrived at Romo's apartment and stole property only after Romo was dead (*id.*). The prosecutor offered that, if that was what the jury had in mind, "the answer . . . would be no" (1544). The judge proposed that

the response be, "The answer is yes and no, depending on the facts as you the jury find them to be and apply them to the law" (*id.*).  When petitioner's counsel objected, the judge cautioned against "assuming" that the note even was asking about petitioner, given that the case involved two defendants (*id.*).

Petitioner's counsel asked if the judge was "amenable" to asking the jury to "be more specific" (1544).  The judge stated, "See, I think my response is responsive to them and directs them to be more specific" (1545).

The judge elaborated, "They are looking for a definitive answer, they are looking for the court to say yes period or no period, and I'm telling them, no, you cannot analyze this that way" (1545).  Counsel maintained that "there [wa]s a definitive answer," but immediately added, "depending on certain things" (*id.*).  The judge promptly interjected that those "things" were "[t]he facts as [the jurors] find them to be and their application" (*id.*).  Counsel insisted that "[t]he definitive answer is no, depending on the inquiry" (*id.*) and again invoked his summation argument based on "certain facts" (*id.*).  Counsel suggested that the judge respond flatly, "If the victim is dead by the time somebody gets to the apartment, then the person cannot be guilty of robbery" (1546).  The judge rejoined that "You don't know what the two guys agreed to in advance" and that the arrival could be "part of the conspiracy" (*id.*).

Counsel then proposed that the judge instruct that guilt required a defendant "to have the intent to commit a robbery and participate in the robbery" (*id.*), and that "if the person does not intend to forcibly steal property from someone because the person

is already dead, [he] cannot be guilty of robbery" (*id.*).  On the other hand, Ralph's counsel stated that he had no issue with the court's proposed response (*id.*).  The prosecutor worried that petitioner's proposed response would "get[ ] the [c]ourt too involved in starting to work with the facts" (1546).

The judge agreed and stated that he was "very hesitant to work with the facts," because he did not want to "nudge the jury in [the] direction of a particular fact," and did "not know . . . the specific facts [the jurors were] wrestling with" (1546-47). Further, the judge asserted, his proposed response was "the truth" and "the law" (1547). The judge added that his proposed response would allow the jury to request "further clarification" (*id.*).  At petitioner's counsel's request, the judge agreed to expressly instruct that, if the jurors required additional guidance, they should "send . . . a further note" (*id.*).

When the jury returned to the courtroom, the court addressed the questions in the note, in order.  First, the court repeated its instructions on the meaning of "acting in concert" (*see* 1548-51).  Again, the court explained that a defendant could be held criminally liable for another person's criminal conduct if, "acting with the state of mind required for the commission of that offense, he or she solicit[ed], request[ed], command[ed], importune[d] or intentionally aid[ed] such person to engage in such conduct" (1549).  The court reiterated that "mere presence at the scene of a crime, even with knowledge that the crime is taking place, or mere association with a perpetrator of a crime does not by itself make a defendant criminally liable for that crime" (*id.*).  The

court also reminded the jurors that the State "ha[d] the burden of proving beyond a reasonable doubt that a defendant acted with the state of mind required for the commission of the crime, and either personally or by acting in concert with another person committed each of the remaining elements of the crime" (1550).

After also repeating its instructions on the elements of the charged crimes and the meaning of proof beyond a reasonable doubt (1551-58), the court answered the third question in the note as follows:

> Jurors, the answer to that question is both yes and no, depending upon the facts as you find them to be and depending upon how you apply those facts to the law as I have given it to you.
>
> If after you go back inside and you continue your deliberations and you apply what I just said to you and you still need additional guidance, feel free to send us another question, perhaps a little bit more specifically, a little more specific.
>
> Of course, do not divulge in your question what the jury is wrestling with and struggling with.  Perhaps you could give us more direction so my response can be a little clearer

(1558-59).

The judge asked the foreperson whether "his responses thus far [had] been responsive to your note" (1559).  The foreperson responded, "Yes" (1559).  The jury sent additional notes (*see* 1559-65, 1565), but never requested additional guidance on the subject of the inquiry at issue.

At 12:47 p.m. the following day, the final jury note reported that the jury had reached a verdict (1570).

**B. The disputed supplemental instruction fails to warrant habeas relief.**

Ordinarily, the propriety of a state trial court's jury instructions constitutes a matter of state law and does not raise a federal constitutional question that might provide a basis for habeas relief.  *See Gilmore v. Taylor*, 508 U.S. 333, 344 (1993) ("instructional errors of state law generally may not form the basis for federal habeas relief"); *Estelle*, 502 U.S. at 71-72; *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).  To warrant habeas relief, a state court's instructions must be more than "undesirable, erroneous, or even universally condemned." *Cupp*, 414 U.S. at 146 (internal quotation marks omitted); the instructions must have resulted in a due process violation.  An instruction violates due process if it fails to give effect to the requirement that "the State must prove every element of the offense." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  But broadly speaking, habeas relief is unwarranted unless the relevant instruction "so infected the entire trial that the resulting conviction violates due process." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009), *quoting Cupp*, 414 U.S. at 147; *Middleton*, 541 U.S. at 437.

Moreover, a habeas court must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *California v. Brown*, 479 U.S. 538, 541 (1987); *see Waddington*, 555 U.S. at 191.  "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 147 (citation omitted); *see Durden v. Greene*, 492 F. Supp. 2d

414, 421 (S.D.N.Y. 2007) ("the main and supplemental jury charges [should be] viewed as a whole, not in artificial isolation").

Here, the disputed supplemental instruction was not erroneous as a matter of state law.  Moreover, especially viewed together with the main and other supplemental instructions, the court's "yes and no" answer by no means resulted in a due process violation.  Therefore, the disputed supplemental instruction provides no basis for habeas relief.

Under State law, the trial court must provide a "meaningful response" to a jury inquiry.  *People v. Steinberg*, 79 N.Y.2d 673, 684 (1992) (citation omitted); *People v. Almodovar*, 62 N.Y.2d 126, 131 (1984); *see* New York Criminal Procedure Law ("CPL") 310.30.  The adequacy of a response is gauged by the form of the jury's question, the particular issues about which inquiry is made, the response actually given, and the presence or absence of prejudice to the defendant.  *Steinberg*, 79 N.Y.2d at 684; *Almodovar*, 62 N.Y.2d at 131.  A response to a jury inquiry warrants reversal of a conviction under State law only when the defendant demonstrates that he was "seriously prejudiced."  *People v. Lourido*, 70 N.Y.2d 428, 435 (1987).  Further, similarly to what federal law provides, supplemental instructions must be viewed together with the court's main charge to determine whether the charge as a whole conveyed the appropriate legal principles to the jury.  *See People v. Simmons*, 15 N.Y.3d 728, 729 (2010).

As the Appellate Division determined, the inquiry to which the disputed supplemental instruction responded "[i]n essence . . . was unanswerable as a written."

*Stokes*, 149 A.D.2d at 511.  The relevant inquiry "appeared to call for a yes or no answer, but could not reasonably be answered in that manner."  *People v. Wilkins*, 16 A.D.3d 217, 217 (1st Dept. 2005).  Indeed, the inquiry failed to specify the "person" to whom it referred – which itself created uncertainty in this two-defendant case.  The trial court appropriately eschewed making assumptions about the inquiry's basis and import.

Moreover, even assuming that the inquiry was prompted by the summation argument on behalf of petitioner, the court correctly perceived that it did not include sufficient facts for a definitive "yes" or "no" response.  Even had petitioner arrived at the apartment after Romo already was dead, that fact alone would not have absolved petitioner of guilt for the charged crimes.  As the trial court reasoned, if the late arrival was part of a preconceived plan for forcibly stealing Romo's property, to which petitioner and Ralph had agreed in advance, both brothers still could have been guilty of the robbery and felony murder.  *See People v. McGinis*, 253 A.D.2d 725 (1st Dept. 1998) (affirming conviction of first-degree robbery, reasoning that the defendant could be considered a knowing participant in the crime based, *inter alia*, on "the timing and orchestration by [the] defendant of his arrival at the crime scene in the livery cab").

Tellingly, petitioner's summation had rested on additional factual contentions, such as that petitioner went to the apartment only to help Ralph clean up, knowing nothing about why Ralph had gone there or what Ralph had done.  The jury's inquiry, however, ignored those separate factual issues.  Accordingly, the court was correct that a definitive answer to the inquiry depended on additional factual determinations by the

jury and appropriately conveyed as much.  *See Steinberg*, 79 N.Y.2d at 685 (negative response to jury inquiry "might have obscured the jury's right to make a [relevant] factual finding").

At the same time, the court's response properly invited the jury to clarify its inquiry if the jury desired additional guidance.  *See People v. Pilgrim*, 146 A.D.3d 478, 479 (1st Dept.), *lv. denied*, 29 N.Y.3d 1085 (2017).  That invitation obviated any possibility that the jury might have felt the court was dismissing its inquiry.

Furthermore, as the Appellate Division emphasized, the trial court otherwise properly instructed the jury on "the elements of the crimes and the concept of accessorial liability."  *Stokes*, 149 A.D.3d at 511.  The jury's inquiry whether a "person" could be criminally culpable if he arrived after the victim was dead turned on those legal principles.  As the Appellate Division stressed, in responding to the first two questions in the jury note, the trial court "had just "reinstruct[ed] the jury on" those principles. *Id.*  Petitioner has never disputed that the reinstructions accurately stated the law.  Thus, the trial court's immediately preceding supplemental instructions "tended to provide guidance on the issue that appeared to have prompted the jury's abstract question." *Id.* Similarly, the main instructions also had furnished such accurate guidance.  Accordingly, the instructions as a whole provided the jury with "a correct interpretation of the law" relevant to the jury's inquiry.  *See California v. Brown*, 479 U.S. at 541.

Even had the supplemental instruction been deficient under state law, no due process violation resulted.  Again, because the trial court otherwise accurately instructed

the jury on the elements of the crimes and the concept of accomplice liability – as well as on the People's burden of proof – the disputed supplemental instruction could not have caused the jury to convict petitioner on less than proof beyond a reasonable doubt of every element of the charged crimes.  Moreover, any error could not have "so infected the entire trial that the resulting conviction violates due process," *Waddington*, 555 U.S. at 191; *see Durden*, 492 F. Supp. 2d at 422, where overwhelming evidence established that petitioner, as well as Ralph, personally brutalized Romo in the course of forcibly stealing Romo's property and killing him.

More particularly, as the prosecutor argued on summation, Romo's severely bludgeoned body and the intricate manner in which the victim had been bound showed that the brutal attack "was a two-man job" (1447-48).  Further, Doughty testified that, in the cab they took back to the Lincoln Houses, petitioner stated, "That motherfucker wouldn't shut up.  I had to punch him so fucking hard that I busted his ear" (621).  That statement both constituted an admission that petitioner personally struck Romo and showed that Romo was very much alive when petitioner lacerated his ear.  Similarly, Doughty's testimony that petitioner asked Ralph what the victim had said the PIN number for his bank card was strongly suggested that petitioner was there when Romo was pressed for that information.  And, Doughty testified that, immediately after the crime, she observed injuries to one of petitioner's hands, as well as blood on petitioner's clothing.

Other evidence also firmly placed petitioner at the scene when Romo was robbed and killed. Significantly, Romo's next-door neighbor, Daines heard cries for help and loud noises at about 11:45 p.m. While Daines did not realize it at the time, those undoubtedly were the sounds of Romo being attacked. And, surveillance video showed that petitioner entered 87 Hamilton Place at 11:25 p.m. and left at around 12:05 a.m. the next morning. Thus, the evidence showed that petitioner was inside the building at 11:45 p.m. when Romo was being brutalized.

Additionally, petitioner's DNA was found in a blood stain on Romo's refrigerator door. Tellingly, the only other DNA found in that stain belonged to Romo. Especially given all the other evidence, the only reasonable inference was that petitioner touched the refrigerator while some of Romo's blood still was on his hand from his participation in the vicious attack.

*** 

For all these reasons, the disputed supplemental instruction affords petitioner no basis for habeas relief.

## POINT III

THE TRIAL COURT REASONABLY EXERCISED ITS
DISCRETION TO DENY PETITIONER'S MOTION
TO SEVER HIS TRIAL FROM THAT OF HIS
CODEFENDANT BROTHER, AND PETITIONER'S
CONTRARY CLAIM AFFORDS NO BASIS FOR
HABEAS RELIEF.

Nor is petitioner entitled to habeas relief because the state court denied his pretrial motion to sever his trial from that of his brother on the ground of antagonistic defenses. In particular, and contrary to petitioner's contention, the ruling made under state law principles governing joinder did not deprive petitioner of a fair trial.

The joint trial afforded petitioner a fair determination of his guilt or innocence. Significantly, neither petitioner nor Ralph presented evidence that incriminated the other in Romo's robbery and death. Instead, petitioner's contention that his and Ralph's defenses were antagonistic ultimately rested primarily on his counsel's summation argument, based on the State's evidence, that petitioner came to the scene after Ralph had killed Romo, only to help Ralph clean up. For his part, Ralph argued that he had nothing to do with the crimes – but notably never suggested that petitioner did. The Appellate Division reasonably rejected petitioner's contention that his counsel's one-way finger-pointing established an "irreconcilable conflict" between petitioner's and Ralph's defenses so as to have required a severance. *Stokes*, 149 A.D.3d at 511. Therefore, the denial of petitioner's severance motion affords no basis for habeas relief.

**A. The relevant record.**

Initially, petitioner and Ralph requested separate trials based on *Bruton v. United States*, 391 U.S. 123 (1968).  In support, Ralph noted that petitioner had told the police that he and Ralph had "do[ne] robberies together" and that, when they did, Ralph was the "inside person" and "the brains," while petitioner was "the muscle" who did "the dirty work" (Exh. A ¶ 7).  Ralph had not made any statement that incriminated petitioner.  Ultimately, because of a *Miranda* violation, the State withdrew its notice to introduce petitioner's statement into evidence at trial (PT 86, 95), and the suppression court precluded the State from using the statement even as impeachment (*see* PT 207-08), rendering moot any *Bruton* concern.

After the case was sent out for hearings and trial on March 18, 2014, petitioner's counsel orally "adopt[ed]" Ralph's request for a severance under *People v. Mahboubian*, 74 N.Y.2d 174 (1989), based on assertedly antagonistic defenses (*see* PT 8-11).  At the court's request, petitioner's counsel additionally submitted written papers, dated that same day, in which he asserted that petitioner intended to argue that Ralph killed Romo by himself, and that petitioner "went to the building after Ralph called him" (Exh. B p. 7).  Counsel also stated that he believed that Ralph would deny having killed Romo or being at the apartment when the murder occurred (*id.*).  Counsel maintained that the two defenses were "irreconcilable" and that he would act as "a second prosecutor" against Ralph, thereby "caus[ing] Ralph to suffer compelling prejudice" (*id.*; internal quotation marks omitted).

The State submitted opposing papers, challenging the severance motion both as untimely and on the merits (Exh. C).  Among the merits arguments, the State asserted that: there was "extensive evidence" that petitioner and Ralph both participated in the robbery (*id.* p. 8); "simply claiming that they intend[ed] to ask the jury to speculate about alternative adverse theories [wa]s inadequate to warrant a severance" (*id.* p. 9); and petitioner and Ralph could not establish the second prong of the *Mahboubian* test, which required that the inconsistency between defenses alone would cause the jury to convict (*id.* pp. 9-10.).

The next day, March 19, the proceedings reconvened for a hearing on Ralph's motion to suppress his phone statements to the police and on whether petitioner's statement met the voluntariness standard to be used as impeachment, as well as to address still outstanding pretrial issues.  At the outset, petitioner and Ralph both requested an adjournment to determine "who actually committed this murder" (PT 93). As previously stated, the court denied that request (*see* PT 94-95).  After the brief hearing testimony, the court and parties turned to the remaining pretrial issues, including the severance requests (PT 165).

First, the court held an *ex parte* discussion with the two defense counsel (PT 167-68).[9]  Petitioner's counsel stated that he would present petitioner's defense by using the State's evidence and cross-examining the prosecution witnesses (PT 169-73).  The court

---

[9] The minutes subsequently were unsealed for purposes of the state court appeal.

remarked that whether the defendant would testify or otherwise put on a defense case was a major consideration in ruling on a severance request (PT 173-74).  In addition, the court commented that it appeared that the "only one [who would be] hurt" by a joint trial would be Ralph (PT 175).  Counsel "agree[d]" that Ralph would be "most prejudiced," but insisted that petitioner also would be "significantly prejudiced based on the mutual[ly] antagonistic nature of the defenses" (PT 176; *see* PT 182).

Back in open court, the prosecutor argued, among other things, that it was common for defendants in multi-defendant cases to point fingers at one another, and that, absent the defense presenting evidence, such "finger-pointing" was insufficient to warrant a severance under *Mahboubian* (PT 189-90).  The prosecutor additionally stressed that, regardless of whether the anticipated defenses were "irreconcilable," petitioner and Ralph could not satisfy the prejudice prong of the applicable test (PT 193-94, 195-96).

The next day, March 20, after rendering its decision on the hearing issues, the court denied both severance motions (PT 213).  The court stated that, while it was not denying the motions on timeliness grounds, the delay in moving for severance affected the motions' "credibility" and "legitimacy" (PT 213).  Similarly, the prior day's request for an adjournment to conduct further investigation into the identity of the "true perpetrators" "fl[ew] in the face of" petitioner's proclaimed defense (PT 213-14).  And, petitioner had affirmatively represented that he would not testify (PT 214).

Thus, the court stated, "while the core of each defense may appear to be in irreconcilable conflict with the other, there appear[ed] to be virtually no possibility the jury [would] ever hear either defense, much less both" (PT 214). Further, the court found, even were the jury to hear the defenses, the "conflict alone would not lead the jury to infer either defendant's guilt" (PT 214-15). Nor would petitioner's defense render his counsel "a second prosecutor" (PT 215). The court elaborated that "[a] defense attorney acts as a second prosecutor only where he can offer evidence against the other defendant which fills gaps in the People's case" – which the defense proffers had not suggested would occur in this trial (PT 215). Finally, the court noted that the trial was expected to take three or four weeks and to entail testimony from about thirty-five witnesses, some coming from out of state (PT 216).

At trial, neither defense opening statement implicated the codefendant (*see* 34-41). Both in his opening and on cross-examination, petitioner's counsel vigorously attacked Doughty's credibility (*see* 39-41, 716-33, 738-51, 756-67). On his cross-examination of Doughty, petitioner's counsel also asked questions designed to show that Doughty disliked petitioner and might have implicated him to help Ralph, and that Doughty and Ralph had wanted to keep any money they got that night for themselves (835-40, 868). Counsel also suggested that Doughty's testimony about petitioner's admission that he had "busted" the victim's ear was at odds with her prior accounts of the admission (PT 866-69). But counsel did not seek to get Doughty to testify that the admission actually had been made by Ralph.

Petitioner presented only a nominal defense case, and Ralph did not present any defense case. Petitioner's only witness was Detective Dimuro, whom petitioner briefly recalled to testify that, when Ralph called him on the phone, Ralph volunteered that he was not "gay" and did not take drugs (1252).

The crux of petitioner's summation was that petitioner arrived at the building after Romo already was dead, unaware of what had happened to Romo, without any intent to rob the victim, and thus was not guilty of the charged crimes. Counsel also spent a substantial portion of his summation attacking the credibility of Doughty generally, including her testimony incriminating both defendants (1332, 1335-49, 1352-53). To be sure, in the course of arguing that petitioner did not arrive at the building until after Romo was dead, petitioner's counsel accepted the conclusion that "the evidence demonstrate[d] that Ralph Stokes killed Charles Romo" (1330; *see, e.g.*, 1329, 1333, 1346-47). However, counsel never implied that Ralph had confessed the crime to petitioner. To the contrary, petitioner's counsel specifically submitted that the jury could not conclude that, when Ralph phoned petitioner at about 11:04 p.m. on the night of the murder, Ralph told petitioner that he had killed Romo (1321-22).

## B. The denial of petitioner's severance motion fails to warrant habeas relief.

Joint trials of defendants who are indicted together "play a vital role in the criminal justice system," as "[t]hey promote efficiency and . . . avoid[ ] the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quotation marks and citations omitted). For severance purposes, this Circuit considers

defenses "mutually antagonistic" "when accepting one defense requires that the jury must of necessity convict a second defendant." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (quotation marks and citation omitted).  Still, the Supreme Court has stated that "[m]utually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538.  On direct federal review, the denial of a severance motion based on assertedly antagonistic defenses is reviewable only under an abuse-of-discretion standard, which this Circuit has stated limits relief to cases where the denial "caused the defendant substantial prejudice amounting to a miscarriage of justice." *United States v. O'Connor*, 650 F.3d 839, 859 (2d Cir. 2011) (quotation marks and citations omitted).  Limiting instructions may suffice to cure any risk of prejudice.  *Zafiro*, 506 U.S. at 539.  As articulated by the Supreme Court, mutually antagonistic defenses do not require severance unless there is a "serious risk" that "a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.*

Habeas review of a state court's denial of a severance motion based on assertedly antagonistic defenses is at least as limited as provided by the standard for direct review of a federal court's ruling.  *See Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990).  "Joinder rules are a matter of state law" and, as previously stated, "federal habeas corpus relief does not lie for errors of state law." *Funches v. Walsh*, No. 05-CV-2839(NRB), 2006 WL 1063287 at *8 (S.D.N.Y. April 21, 2006), *aff'd*, 264 Fed. Appx 45 (2d Cir. 2008), *citing Estelle*, 502 U.S. at 67.  Habeas relief may be granted only where the state trial court's

denial of a severance motion so severely prejudiced the defendant as to rise to the level of a due process violation. *Grant*, 921 F.2d at 31. Moreover, habeas relief will not be granted unless the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." *Terry v. Conway*, No. 11-CV-2647 (RRM), 2016 WL 3983516, at *4 (E.D.N.Y. July 25, 2016), *quoting Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see Fry v. Pliler*, 551 U.S. 112, 120 (2007) (stating that, after the AEDPA, "*Brecht* standard of review" still applies "in assessing the prejudicial impact of federal constitutional error in a state-court criminal trial").

Notably, New York state law regarding severance requests based on assertedly inconsistent defenses is similar to the federal law. CPL 200.40(1) provides that a court may order separate trials for jointly-charged defendants "for good cause shown." At the same time, case law provides that where the State's proof of the same charges against several defendants rests on the same evidence, "only the most cogent reasons warrant a severance." *Mahboubian*, 74 N.Y.2d at 183, *quoting People v. Bornholdt*, 33 N.Y.2d 75, 87 (1973). Joinder of co-defendants is strongly favored as a matter of public policy, because it "expedites the judicial process, reduces court congestion, and avoids the necessity of recalling witnesses." *Mahboubian*, 74 N.Y.2d at 183. Severance decisions rest within the sound discretion of the trial court, and a defendant's "burden to demonstrate abuse of that discretion is a substantial one." *Id.*

Further, under New York law, inconsistent defenses do not mandate separate trials. Severance is required only when both the "core" of the defenses are in

"irreconcilable conflict" and there is a "significant danger" that "the conflict alone would lead the jury to infer defendant's guilt." *Mahboubian*, 74 N.Y.2d at 184-85. The first prong requires that the defenses be "mutually exclusive." *Id.* at 185. And even if the defenses are "irreconcilable" in that sense, severance is not required unless the defendant satisfies the second prong by establishing that the resulting conflict itself would unjustifiably lead the jury to infer the defendant's guilt, as when the codefendant takes an "aggressive adversarial stance" against the defendant, "in effect becoming a second prosecutor." *People v. Cardwell*, 78 N.Y.2d 996, 998 (1991). The two-part test sets forth an "exacting" standard, *People v. Castro-Restrepo*, 169 A.D.2d 454, 457 (1st Dept. 1991), which will compel severance only in "very limited" circumstances, *id.* at 457.

Here, the Appellate Division reasonably determined that the defenses of petitioner and Ralph "were not in irreconcilable conflict, and there was no significant danger that the conflict alone would lead the jury to infer [petitioner's] guilt." *Stokes*, 149 A.D.3d at 511. As stated, Ralph did not introduce any evidence on his own behalf, and petitioner's defense case consisted only of recalling one witness, Detective Dimuro, to testify that Ralph made what petitioner's counsel asserted were false exculpatory statements denying that he was "gay" or used drugs (*see* 1251-52). Those generalized false representations did not by their terms implicate Ralph in the robbery and murder of Romo. In terms of the evidence, then, petitioner and Ralph did not present conflicting defenses at all, and "[n]either defendant acted as a second prosecutor

68

regarding the other defendant," *Stokes*, 149 A.D.3d at 511.  *Cf. Mahboubian*, 74 N.Y.2d at 185-86 (one defendant presented evidence in support of one of the inconsistent defenses).

Moreover, at bottom, petitioner's summation argued essentially that the State's evidence presented a stronger case against Ralph than against him.  Significantly, such a disparity in the strength of the proof against codefendants "is not sufficient reason to grant a severance."  *United States v. Potamitis*, 564 F. Supp. 1484, 1486 (S.D.N.Y. 1983), *aff'd*, 739 F.2d 784 (2d Cir. 1984); *see People v. Peisahkman*, 29 A.D.3d 352 (1st Dept. 2006).  Thus, that petitioner's counsel argued on summation that the State's proof incriminated Ralph, but not him, was insufficient to render petitioner's and Ralph's defenses irreconcilably inconsistent so as to require a severance.

Further, the inconsistency between Ralph's defense that he had nothing to do with the crime and petitioner's argument that he went to the crime scene after Romo already was dead, to help Ralph clean up, could not by itself have caused the jury to convict petitioner.  *See People v. Abreu*, 219 A.D.2d 513 (1st Dept. 1995).  True, the jury could not have credited both defenses.  But Ralph notably never so much as pointed a finger in petitioner's direction.  Ralph's unadorned and unsurprising, albeit ultimately unpersuasive, denial of involvement could not by itself have caused the jury to find petitioner guilty of the heinous crimes.

Indeed, the trial court's instructions protected petitioner against any such prejudice.  In the final charge, the court instructed the jurors that they alone were "the

judges of the facts and . . . responsible for deciding whether a defendant [was] guilty or innocent" (1490).  The court also stated that, when judging the facts, the jurors were "to consider only the evidence" (1491).  Additionally, the court told the jurors that they were "obligat[ed] to evaluate the evidence as it applies or fails to apply to each defendant separately" (1496).  Emphasizing the point, the court stated that it was the jurors' "sworn duty to give separate consideration to the case of each individual defendant (*id.*). The jurors are presumed to have followed those instructions.  *Zafiro*, 506 U.S. at 540 (citation omitted).  And pursuant to those instructions, the jury would not have decided the case against petitioner based on any inconsistency in the respective defense summation arguments, but instead must have found that the evidence the State presented against petitioner established petitioner's guilt.

By no means did the inconsistent defenses result in a violation of petitioner's due process right to a fair trial.  The inconsistent defenses did not cause a miscarriage of justice, *O'Connor*, 650 F.3d at 859, or "prevent the jury from making a reliable judgment about [petitioner's] guilt or innocence," *Zafiro*, 506 U.S. at 539.

As elaborated in Point II, *supra*, overwhelming evidence established that petitioner personally participated in the brutal, fatal attack on Romo.  *See* pp. 52-53, *supra*.  More particularly, the surveillance video and cell site evidence left no reasonable doubt that petitioner was at the victim's apartment when the victim's neighbor heard the sounds of what in retrospect was the victim being attacked and killed.  And that already compelling evidence corroborated Doughty's damning testimony that,

immediately after emerging from the building where Romo was killed, petitioner had blood on his clothing as well as an injured hand that he attributed to having punched someone so hard that he "busted his ear" (621) – which comported with the autopsy finding that Romo's left ear had been essentially ripped in half.  So, too, the numerous injuries and chemical burns Romo sustained, and the way Romo's hands and ankles had been bound, had to have been the work of more than one individual, and petitioner's DNA was found together with Romo's DNA in a blood stain on the victim's refrigerator door.   Thus, overwhelming evidence of guilt showed that petitioner's conviction reflected a "reliable judgment," *Zafiro*, 506 U.S. at 539, that petitioner committed the crimes.

By the same token, the overwhelming evidence of petitioner's guilt belies any notion that the denial of petitioner's severance motion "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.  For that reason as well, petitioner's claim that the denial of the severance motion denied him a fair trial does not warrant habeas relief.

*** 

Thus, the state trial court's denial of petitioner's severance motion did not deprive petitioner of his due process right to a fair trial, and does not entitle petitioner to habeas relief.

<u>CONCLUSION</u>

For the foregoing reasons, the writ of habeas corpus should be denied, and the petition should be dismissed, without an evidentiary hearing, pursuant to Rule 8(b), Rules Governing 28 U.S.C. § 2254 cases.

Respectfully submitted,

CYRUS R. VANCE, JR.
District Attorney
New York County

BY:  *Sylvia Wertheimer*
SYLVIA WERTHEIMER
Attorney of Record
wertheimers@dany.nyc.gov

CHRISTOPHER P. MARINELLI (CM-7476)
SYLVIA WERTHEIMER (SW-6225)
  Assistant District Attorneys
    Of Counsel

March 1, 2019